UNITED STATES FOR THE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
VINCENT WARREN,                                 :

               Petitioner,                   :

       -against-                              :        **REPORT AND RECOMMENDATION**

DAVID NAPOLI,                                   :            05 Civ. 8438 (CM)(KNF)

              Respondent.                  :
--------------------------------------------------------x
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE COLLEEN MCMAHON, UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Before the Court is Vincent Warren's ("Warren"), third amended petition for a writ of

habeas corpus, made pursuant to 28 U.S.C. § 2254, challenging his conviction for second-degree

murder, following a jury trial in New York State Supreme Court, Bronx County.  Warren

contends his confinement by New York State is unlawful because: (1) the prosecutor engaged in

misconduct by (a) allowing Sholey Juah ("Juah") to testify falsely and by failing to disclose that

Juah received "benefits" for testifying against Warren at trial, (b) failing to disclose "two Police

Memo[s] which contradicted the prosecution's trial theory and impeached substantially the

testimony of Donnell Green[ ("Green"),] the allege[d] sole eye-witness," and (c) allowing

Kareem Deas ("Deas") to testify falsely that he was in a holding pen with Warren, at which time

Warren admitted to killing Bruce Phillips ("Phillips"); (2) evidence of Warren's prior bad acts

and uncharged crimes was admitted into evidence improperly; (3) the trial court engaged in

improper "marshaling of the evidence" by (a) "bolster[ing] the credibility of prosecution witness

Detective Robert Altieri [("Altieri")]," through "a[n] unbalanced charge" to the jury, and (b)

providing an "unfair and unbalanced marshal in regards to the seriousness of . . . Juah's [Staten Island] criminal case"; (4) Warren was deprived of his right to be present at all stages of trial, with the representation of counsel, when the trial court responded to a note from the deliberating jury outside the presence of Warren and his counsel; (5) his trial counsel provided ineffective assistance to him by failing to (a) object to the prosecutor's comments and inferences, during opening and closing statements, that Warren fled from Bronx County, to Staten Island, after Phillips was shot, (b) object to the admission of a redacted letter allegedly written by Deas and sent to Mona McCloud ("McCloud"), Phillips' mother, (c) impeach Altieri, (d) locate "a grandmother" who spoke with police officials, (e) object to crime scene photographs being received in evidence, (f) object to testimony by Detective Vincent Price ("Price"), relating to two anonymous telephone calls informing him that Warren was responsible for Phillips' death, and (g) interview Warren's prior defense attorney; and (6) his appellate counsel provided ineffective assistance to him by failing to (a) file an appellate brief, without first discussing it with the petitioner, (b) assist the petitioner in investigating the full extent of Juah's criminal history, and (c) raise the following issues on direct appeal: (i) a Brady[1] violation occurred; (ii) the prosecution engaged in misconduct by procuring perjured testimony from Juah; (iii) testimony given by Altieri and Green, at Warren's retrial, conflicted with their testimony at Warren's first trial; (iv) trial counsel was ineffective for failing to move to dismiss the indictment; (v) hearsay testimony was admitted into evidence, improperly, at the petitioner's pre-trial hearing and at the petitioner's trial, when Price was permitted to testify about anonymous telephone calls he received; (vi) the trial

---

[1] In Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), the Supreme Court held that it is a violation of due process for the prosecution to withhold evidence favorable to the accused, when such evidence is material to guilt or punishment.

court's Huntley[2] decision was based upon a misstatement of facts, and trial counsel was ineffective in failing to object and inform the trial court of its error; (vii) the trial court denied improperly trial counsel's request to recross-examine Juah; and (viii) trial counsel was ineffective in failing to object to: (A) the admission into evidence of a document purporting to be a typed statement, based upon an interview of Warren by police personnel, (B) the trial court's "interference" with Warren's trial by "marshaling evidence" relating to the testimony of Altieri and Juah, and (C) the trial court's communication with the jury outside Warren's presence.

Respondent opposes the petitioner's application, which is analyzed below.

## II. BACKGROUND AND PROCEDURAL HISTORY

On December 31, 1998, police officers and paramedics responded to 4044 Laconia Avenue in the Bronx, at approximately 6:30 p.m. Upon arrival, it was determined that Phillips, who was "lying [on the ground] face up, . . . in a pool of blood," was dead. Price spoke with witnesses at the crime scene, and later received anonymous telephone calls, leading him to "focus the investigation on" Warren. Police officials were unable to locate Warren until March 25, 1999, when he was arrested on Staten Island.

After his arrest, the petitioner was indicted for one count of : (i) second-degree murder; (ii) first-degree manslaughter; (iii) first-degree criminal use of a firearm; (iv) second-degree criminal possession of a weapon; and (v) third-degree criminal possession of a weapon. At a pre-trial Huntley hearing, held prior to the commencement of the petitioner's first trial, Warren alleges that, after listening to testimony by Altieri, the trial judge found that, "after [Warren] was read his Miranda warnings he knowingly agreed to make a statement [to police personnel], after the

---

[2] A hearing pursuant to People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (1965), is held to determine the voluntariness of a confession or admission made by a criminal defendant.

oral statement was reduced to typing, defendant read it and found [it in] his best interest not to sign it." Thereafter, the petitioner proceeded to trial by jury, which resulted in a mistrial.

On January 17, 2001, a hearing was held, before the petitioner's retrial commenced, to resolve, inter alia, the prosecution's Molineux[3] application, regarding the extent to which Altieri would be permitted to testify about his prior contact with Warren on two unrelated criminal matters. The trial court found that, since the defense was planning to attack Altieri's credibility – by challenging whether Warren made a statement to him – "the People should be allowed to establish some sort of rapport" existed between Altieri and Warren. The court instructed:

> during the direct testimony of Detective Altieri the only thing that the People may elicit from Detective Altieri with respect to a relationship with the Defendant is the following: You may not bring out the fact that [Warren] was under arrest in Pennsylvania and that [Altieri] had gone up to Pennsylvania to get him.

Additionally, the trial court determined Green's anticipated testimony, that Warren offered him a gun after Green had an altercation with Phillips, was admissible. Following voir dire, the retrial commenced on January 18, 2001. The prosecution noted, during its opening statement, that, after Warren shot Phillips, "[h]e ran as far as Staten Island where he was arrested three months later."

Testimony at trial established that, on December 24, 1998, Green got into a "fist fight" with Phillips, which ended without injury to either party. On December 25, 1998, Green saw Phillips and asked him "what was going on with all that last night," Phillips responded "leave it alone," and Green punched Phillips in his mouth. Green testified that, after he punched Phillips, Warren displayed a gun and offered it to Green. Green declined Warren's offer.

In January 1999, Warren attended a gathering, where Juah heard Warren "talking about a

---

[3] A hearing pursuant to People v. Molineux, 168 N.Y. 264 (1901), is used to determine whether evidence of uncharged crimes may be admissible to show, inter alia, proof of motive, common scheme or plan, and intent.

murder that happened in the Bronx, that he supposedly had did." Juah testified that Warren seemed "very proud" and was bragging about the murder, and "indicated that he put the person's name on his arm to remember his first homicide. . . [and Warren] showed [Juah] the tattoo." The tattoo stated "Famous," and "Rest in Peace." "Famous" was a nickname for Phillips.

In March 1999, Juah contacted Detective Koleniak ("Koleniak"), and informed him of Warren's statements regarding Phillips' murder. Juah stated that she delayed contacting Koleniak because she "had things to do." The jury learned Juah had been convicted twice, on Staten Island, for misdemeanor assault, upon a plea of guilty, and was sentenced to a conditional discharge and fined $600. The trial judge inquired, "[a]t the time you called Detective Koleniak, did you have a case pending against you in Staten Island," and Juah responded that she did not think so. Juah noted that, after March 1999, Koleniak "intervened to help [her]" on her criminal assault case, and "[t]his was after [she] already spoke to him about [Warren]." However, after a "N.Y.S.I.I.S. sheet" was presented at trial, which documented that Juah was arrested on January 22, 1999, Juah recalled that, in March 1999, she was "out on bail." Juah stated she had no other arrests. The court asked Juah whether she was "motivated to some extent to call Detective Koleniak because giving this information had to do with [her] own case," and Juah responded that her case "wasn't even that serious because [she] was out on bail." The court inquired whether Juah was charged with a felony or misdemeanor, and when Juah stated she was charged with a misdemeanor, the trial court responded, "[s]o [i]t couldn't be too serious."

In March 1999, Altieri transported Warren from a precinct on Staten Island, where Warren was held after his arrest, to the 47th police precinct, located in the Bronx. Altieri provided <u>Miranda</u> warnings to Warren, by reading each warning to Warren, and then having

Warren read and initial each warning, and write "yes or no" next to each warning.  The prosecution offered into evidence the document Altieri used to advise Warren of his <u>Miranda</u> rights.  After administering <u>Miranda</u> warnings, Altieri spoke with Warren about their previous contact and testified that they "had a positive relationship in the past."  While speaking with Altieri, Warren stated "he shot the victim in self [d]efen[s]e . . . through his jacket."  Warren told Altieri that Phillips "came up to [Warren], was going to rob him and [Phillips] stuck a gun in [Warren's] face and [Warren] had no choice but to shoot him."  Warren refused to write a statement, and Altieri typed a police report based upon Warren's oral representations "as soon as [he] left the [interview] room."

In October 1999, Deas had a conversation with Warren, while both were incarcerated. Deas explained that, he and Warren "came out together for court," and Deas asked Warren about Phillips' death and Warren's arrest.  Deas stated that Warren responded that "it was over some hate and shit," displayed a tattoo, and stated he did not "want it to go down like that."  Deas testified that he wrote a letter to Phillips' mother, McCloud, relaying the information Deas learned from his conversation with Warren.  A copy of that letter was admitted into evidence, without objection by defense counsel.

On cross-examination, defense counsel asked Deas whether he used the "word hate [in his letter to McCloud]," in describing his conversation with Warren. Deas responded he did not use the word "hate," but rather wrote that Phillips' death "had to do with jealousy."  Defense counsel asked whether the letter stated that Warren killed Phillips; Deas responded it did not. Deas confirmed the letter did not contain a reference to the statement made purportedly by Warren that he "didn't want it to go down that way or any[] [statement] like that."

Following Deas' testimony, the People rested, and the defense played a video tape for the jury. The trial judge described the video tape as depicting "an attempt by the Assistant DA to take a statement from the defendant. . . .  And it occurs on March 25th, 1999 at around 9:00...."

Warren testified on his own behalf. He recalled that, on the night Phillips was shot, he went to a store to buy cigarettes and, when he left the store, heard gunshots and hurried home. Warren testified a "gang war" ensued, and he decided he did not want "to be part of that" and left the Bronx to live on Staten Island. Warren stated that, the night Green "sucker-punched [Phillips] from the blind side," Green "went in his pocket, he had a gun, Bruce left" and Warren ran away. Warren confirmed that he went to Staten Island after Phillips was shot, and that he was "on the run [] from the police" and was "on the run in Staten Island."

Warren informed the jury he remained incarcerated following his arrest, and that, he came into contact with Deas, while he was incarcerated, in 1999. Warren explained that:

> it was like for a court appearance. They put you in the court pen. He started going in a rage and he tried to assault me, so we had a fight. I had to defend myself. I got the best of him, went to court and some call it a go-back, you come back from court. We came back from court. I told him what happened, that I had nothing to do with it, I showed him the tattoo, you know what I'm saying?

On cross-examination, Warren affirmed he was given his Miranda rights by Altieri, and signed "yes" and his name next to a statement indicating he agreed to answer questions. During questioning, Altieri asked Warren, "isn't it true you shot [Phillips] through your coat," and [Warren] told him that's not true." No other witnesses testified on behalf of the defense, at the trial.

During the prosecutor's summation, he stated, inter alia, that after Phillips' murder, police officials "trie[d] to find Vincent Warren," and went to "his last known address," and to

"places where he hangs out," but "Warren [wa]s nowhere to be found.  Vincent Warren [wa]s on

the run, ladies and gentlemen, on the run in Staten Island."

     While delivering its instruction to the jury, the trial court discussed the jury's duty to

assess the credibility of witnesses, and explained, <u>inter</u> <u>alia</u>, that, as to police officers,

> [they] should be treated like any other witness that took the stand.  You don't accept
> their testimony because they're police officers and you shouldn't reject their
> testimony because they're police officers.  You decide for yourselves, did each police
> officer who took the stand tell the truth?  That's your decision to make based on the
> testimony that he gave.
>
>     Now Detective Altieri said that in talking to the Defendant, the Defendant
> made a statement to him admitting that he shot the deceased through his coat while
> the deceased was putting a gun in his face.  You recall that, I'm sure.
>
>     Now what's the law of the State of New York with respect to such a
> statement–first and foremost, the Defendant denies making that statement.  He
> testified yesterday.  You heard his testimony, so you have to decide first and foremost
> are you convinced beyond a reasonable doubt that he did make that statement?  Did
> he say that?
>
>     If you say that he said that, then before you may evaluate it, certain things
> must occur.
>
>     One, you must be convinced and satisfied that he was advised of his
> Constitutional rights.  I think we had an item in evidence for you to review in making
> that determination, but you must be convinced that Detective Altieri did give him his
> rights.  If memory serves me I think the Defendant may have admitted that at some
> point he was advised of his Constitutional rights, but denies making the statement.
>
>     Secondly, you must be satisfied beyond a reasonable doubt that the statement
> was voluntary, that it was not the subject of any threat or a promise to induce him to
> make a statement or in other words, what the law says is, we will not permit police
> officers to use any strategem in order to get a person to falsely incriminate himself.

     Before dismissing the jurors from the courtroom to begin deliberations, the trial judge

inquired of the parties, at the sidebar, whether "any last minute requests or exceptions with

respect to [the court's] charge" needed to be made.  Defense counsel responded that the court had

"marshaled some of the evidence, especially on the part of the statement of Detective Altieri."

The court indicated that this exception was duly noted.

At 12:15 p.m., on January 25, 2001, the jury exited the courtroom to begin deliberations. After the jury exited the courtroom, the trial judge asked, "can we have an agreement on the record that if the jury requests the exhibits, we can send those up to the jury without the necessity of reconvening court," to which the prosecutor and defense counsel responded "yes."  The trial transcript reflects that, during deliberations, the jury submitted three notes, which: (1) "request[ed] the exhibits"; (2) stated that portions of an exhibit were illegible; and (3) announced a verdict was reached.

At 3:15 p.m., on January 25, 2001, court re-convened, because the jury had reached a verdict.  At this time, the trial judge addressed the jury's request that illegible portions of an exhibit, which was later identified as the letter Deas wrote to McCloud, be "filled in."   The court stated: "I told you we couldn't do that and we were going to try to get the original.  We never did."  The court confirmed that the jury was "able to continue [] deliberations without receiving [an original copy of the exhibit]."

On January 25, 2001, the jury found Warren guilty for one count of second-degree murder.  The jury was polled, and the verdict was unanimous.  After the jury was excused, defense counsel advised the court that he "was not aware that there was a question from the jury at all concerning any piece of evidence that needed any explanation."  The court responded:

> Well you weren't here, that was the problem.  That note came in approximately ten minutes after you left and I simply told them that we would deal with it later on; that meant between the time I said we would deal with it, I didn't bring the jury down.  I just told the officers to tell them we will try to answer that for them.
> The next thing we knew is we got a verdict.  There was no way we could handle that otherwise.
>                                         * * *
> I liken that to a situation where a jury asks for a readback and there's a delay in complying with that and before you can begin to comply, they indicate that they

have a verdict.

        I asked the Foreperson.  She indicates that they were able to reach a verdict without the necessity of having that–the original.

The court sentenced Warren to an indeterminate term of twenty-five years to life imprisonment. Warren appealed from the judgment of conviction to the New York State Supreme Court, Appellate Division, First Department.

        In October 2002, Warren's appellate counsel filed a brief with the Appellate Division, in which he asserted: (1) admission of evidence of Warren's prior bad acts and uncharged crimes "inferred" improperly to the jury that Warren had a predisposition to commit crimes, in violation of his due process rights; and (2) the sentence imposed was harsh and excessive.  Warren was granted leave to file a pro se supplemental brief, through which he raised the following claims: (a) the prosecution bolstered its case through non-testifying witnesses, when Price testified he received anonymous telephone calls; (b) his right to be present at trial was violated, when the trial judge responded, outside the presence of defense counsel and Warren, to a note from the jury; (c) the trial court "marshaled" evidence improperly; and (d) his trial counsel did not provide effective assistance to him, since counsel failed to: (i) "request a flight charge," (ii) interview a "grandmother," who was a material witness; (iii) prepare sufficiently for trial; and (iv) present unidentified favorable evidence.

        In December 2003, the Appellate Division denied Warren's appeal.  See People v. Warren, 2 A.D.3d 186, 768 N.Y.S.2d 465 (App. Div. 1st Dep't 2003).  The Appellate Division found that: (1) the trial court admitted evidence properly that, prior to the shooting of Phillips, Warren "offered a gun to a person engaged in a fistfight with [Phillips]"; (2) the trial court admitted evidence properly that Warren had "prior contact" with a detective; (3) Warren received effective assistance from his counsel; (4) no basis to reduce Warren's sentence existed; and (5)

Warren's "remaining contentions, including those contained in his pro se supplemental brief, are unpreserved" and the Appellate Division "decline[d] to review them in the interest of justice." Id. at 186-87, 768 N.Y.S.2d at 466.  The petitioner applied for leave to appeal to the New York Court of Appeals.  On March 1, 2004, that application was denied.  See People v. Warren, 2 N.Y.3d 747, 778 N.Y.S.2d 472 (2004).

While his leave application was pending before the New York Court of Appeals, Warren submitted his first New York Criminal Procedure Law ("CPL") § 440.10 motion.  Through that motion, he raised the following claims: (1) the prosecution allowed Juah to testify falsely; (2) the prosecution failed to disclose Brady material, including Juah's complete criminal history, information based on "a deal" between Juah and prosecutors by which Juah testified against Warren in exchange for leniency in sentencing on her Staten Island convictions, and evidence that Green was an initial suspect for Phillips' murder; and (3) trial counsel rendered ineffective assistance to him, since he failed to prepare adequately for trial and was "ignora[nt] of basic criminal law."  In February 2003, the New York State Supreme Court, Bronx County, denied Warren's CPL § 440.10 motion, finding: (a) "all issues raised herein could or should have been raised on appeal," and (b) "unsubstantiated allegations are an insufficient basis herein to predicate consideration of further relief."  Warren moved for leave to appeal from the denial of his CPL § 440.10 motion; in May 2003, the Appellate Division, First Department, denied the application.

In September 2004, Warren submitted an application for CPL § 440.10 relief and an "order to show cause" ("second CPL § 440.10 motion") to compel the prosecution to disclose: (1) the "cooperation agreement and all statements" relating to Juah and (2) "all and every document of Sholey Juah."  In February 2005, the New York State Supreme Court, Bronx

11

County, denied Warren's application.  Warren moved for a certificate granting leave to appeal; in

May 2005, the Appellate Division, First Department, denied this request.  Warren filed an

application for a certificate to appeal to the New York Court of Appeals; this application was also

denied.

In June 2005, Warren moved before the New York Supreme Court, Appellate Division,

First Department, for a writ of error <u>coram</u> <u>nobis</u>, based upon a claim that his appellate counsel

rendered ineffective assistance to him, by failing to: (1) investigate, and raise a claim, relating to

Juah's perjured trial testimony; (2) review and compare trial transcripts from Warren's first trial

and retrial to identify the conflicting testimony given by Altieri, Green and Juah; and (3) submit

an adequate appellate brief, raising all meritorious claims, including (a) hearsay testimony was

admitted into evidence, improperly, at a pre-trial hearing, (b) the "hearing court[] [relied upon a]

misstatement of facts in its decision," (c) the prosecution engaged in misconduct, by failing to

provide defense counsel <u>Brady</u> and <u>Rosario</u>[4] materials, (d) trial counsel provided ineffective

assistance to Warren, since counsel failed to move to dismiss the indictment, and (e) trial counsel

provided ineffective assistance to him, by failing to object to (i) Price's hearsay trial testimony,

(ii) the trial court's "interferences" during the cross-examination of Altieri and Juah, (iii) the

receipt, into evidence, of Altieri's "typed statement" of Warren's communications with him, (iv)

the trial court's refusal to allow recross-examination of Juah relating to a gun, (v) the trial court's

refusal to provide Warren and his counsel an opportunity to confer, in private, regarding evidence

presented, for the first time, at trial, (vi) the trial court's "remarks in regards to the video in which

---

[4]New York requires prosecutors to provide criminal defendants all recorded statements made
by prosecution witnesses prior to the start of opening statements at a trial.  <u>See</u> <u>People v. Rosario</u>, 9
N.Y.2d 286, 290-91, 213 N.Y.S.2d 448, 450-52 (1961).

defendant requested a lawyer," (vii) the admission into evidence of Deas' letter, on the ground that it had been tampered with, and (viii) communications between the court and jury outside the presence of Warren and his counsel.

On April 4, 2006, the Appellate Division denied Warren's motion for a writ of error coram nobis. Warren moved for leave to appeal from this denial, and, on May 31, 2006, the New York Court of Appeals denied Warren's application. Warren moved, before the Appellate Division to reargue his motion for a writ of error coram nobis, and, on August 10, 2006, this request was denied.

In March and June 2005, Warren made a submission to the New York State Supreme Court, Bronx County, in support of his request for reargument of his second CPL § 440.10 motion. In September 2005, Warren's request for reargument was denied. Warren sought permission to appeal from this denial to the Appellate Division; and, in February 2006, the Appellate Division denied Warren's application.

In January 2006, Warren made a motion, pursuant to CPL § 440.10 ("third CPL § 440.10 motion"), to vacate the judgment of conviction. Warren asserted he possessed newly discovered evidence showing Juah lied at trial when she testified she did not have a prior conviction in Minnesota. Warren also alleged the prosecutor committed misconduct, by: (a) failing to disclose Juah's Minnesota criminal record; and (b) allowing Juah to testify falsely. On May 9, 2006, the New York State Supreme Court, Bronx County, denied Warren's motion, noting that "[t]he issue raised here is the same as that raised by defendant in his writ of coram nobis denied by the Appellate Division earlier this year," and "the related Brady issue raised by defendant regarding the same witness was considered by this court and rejected three times, twice within the past year and once in 2003." By an order dated May 22, 2006, the New York State Supreme Court, Bronx

County, noted that a reply had been received after its decision was issued, that the reply was "treated as a motion to reargue or renew," and that such motion was denied. Warren requested leave to appeal from the May 9, 2006 decision and order, to the Appellate Division; on February 22, 2007, his request was denied.

In November 2007, Warren made a motion, pursuant to CPL § 440.10 ("fourth CPL § 440.10 motion"), to vacate the judgment of conviction. In this motion, Warren asserted: (1) he had newly discovered evidence – a "recantation affidavit" by Green; and (2) the prosecution knew, or should have known, Green testified falsely at trial.

In December 2007, Warren amended his fourth CPL § 440.10 motion, and raised an additional claim that the prosecutor knew Deas proffered false testimony, when Deas stated he was held in a court pen with Warren. In March 2008, the New York State Supreme Court, Bronx County, denied Warren's motion, and noted that, "[p]ursuant to a detailed investigation . . . the alleged recanting witness . . . denies the validity of the affidavit contained in the defendant's moving papers." The Appellate Division denied Warren's application for leave to appeal to that court from the denial of his fourth CPL § 440.10 motion.

In March 2008, Warren filed a motion, pursuant to CPL § 440.10 ("fifth CPL § 440.10 motion"), to vacate the judgment of conviction. In this motion, Warren asserted: (1) trial counsel provided him with ineffective assistance, when he failed to move to dismiss the indictment; (2) the prosecution engaged in misconduct, by failing to (a) disclose the "defective indictment bill" and "inmate inquiry documents" and, (b) correct or disclose Deas' false testimony, that he was housed in a court pen with Warren; and (3) he was not duly convicted, because no certificate of conviction exists. In support of his claim that Deas testified falsely, Warren revealed he too had testified falsely "when he [stated] he and Deas had a fist-fight in the Court-pens."

14

In July 2008, the New York State Supreme Court, Bronx County, denied Warren's motion.  The court found that: (1) Warren's challenge to the indictment was procedurally barred, since it was "incomprehensible why the Defendant would not have raised this claim on direct appeal or in one of his prior motions"; (2) Warren's claim, that Deas and he testified falsely, was "contradicted by the official Court transcript"; and (3) Warren's claim relating to his certificate of conviction was procedurally barred; and, in any event, such a certificate exists and was provided as an exhibit to the prosecution's submission opposing the motion.  The court also enjoined Warren from filing further motions, without first seeking permission from the Administrative Judge of the Bronx County Supreme Court, Criminal Term.  Warren applied for leave to appeal from the decision and order of the court.  The Appellate Division denied his request, in September 2008.

The instant application for a writ of habeas corpus followed.

### III. DISCUSSION

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Prosecutorial Misconduct

A.     Failure to Correct Juah's False Testimony and Disclose Favorable Evidence

A federal court may not review a question of federal law decided by a state court if the state court's decision rested on a state-law ground that is independent of the federal question and adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991).  A habeas corpus petitioner may bypass the independent and adequate state-

law ground by showing cause for the procedural default and prejudice attributable thereto or by demonstrating that a fundamental miscarriage of justice will attend if the claim is not reviewed by the habeas corpus court.  See Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989).

The petitioner's prosecutorial misconduct claim was raised in the petitioner's first CPL § 440.10 motion, and denied because these issues "could or should have been raised on appeal." Pursuant to CPL § 440.10(2)(b)-(c), a state court "must deny a [CPL § 440.10] motion to vacate judgment" when sufficient facts existed on the record for a claim to have been raised on direct appeal.  These provisions–CPL § 440.10(2)(b)-(c)–have been held to constitute "independent and adequate" state procedural grounds.  See Brown v. New York State, 374 F. Supp.2d 314, 318-19 (W.D.N.Y. 2005)(CPL § 440.10(2)(b)); Bradley v. LaClair, 599 F. Supp. 2d 395, 406 (W.D.N.Y. 2009) (CPL § 440.10(2)(c)).  The petitioner has shown neither cause for the default and prejudice, nor that a fundamental miscarriage of justice will result, if his claim is not reviewed. Therefore, the Court finds that Warren's prosecutorial misconduct claim is procedurally barred from review.

B.      Failure to Disclose Two Police Memoranda

The prosecution is required to disclose evidence to criminal defendants which is material to either guilt or punishment.  See Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97.  This duty extends not only to evidence that is exculpatory, but also to evidence that could be used to impeach a prosecution witness.  See Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972). In the context of Brady, a criminal defendant is deprived of a fair trial where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985), or where the suppressed evidence "could reasonably be taken to put the

16

whole case in such a different light as to undermine confidence in the verdict," Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995).

Warren maintains that police memoranda dated January 1, 1999, indicate: (1) Phillips was shot as a result of a "dispute [he had] with 'two' male blacks," (2) "a grandmother personally had knowledge that Donnell Green drew a gun on Mr. Phillips on Christmas Day," and (3) Green was a "primary suspect" in Phillips' death.  The respondent contends these documents were disclosed to the defense during the pretrial discovery phase of the criminal action.  However, even assuming, arguendo, the police memoranda were not disclosed, it cannot be said a reasonable probability exists that their disclosure would have led to a different outcome at Warren's trial.  See Bagley, 473 U.S. at 682, 105 S. Ct. at 3383.  Regardless of whether police memoranda referred to two perpetrators, the jury was convinced, beyond a reasonable doubt, that the trial evidence established Warren was responsible for Phillips' death; that a second person may also have been present, does not undermine the jury's verdict.  Additionally, Green testified he had an ongoing dispute with Phillips; he fought Phillips on December 24, 1998, punched Phillips on December 25, 1998, and a gun was available to Green on December 25, 1998.  In light of the testimony at Warren's retrial, information that Green was, at some point, a "primary suspect," or that Green "drew a gun" on Phillips on December 25, 1998, does not serve to undermine confidence in the verdict.

C.     Deas' "False Testimony"

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct.

2392, 2397 (1976). "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993).  "Where the government was unaware of a witness' perjury, . . . a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotations and citations omitted).

Warren contends the prosecutor engaged in misconduct by allowing Deas to testify falsely that he was "ushered into a [c]ourt-pen [with Warren, while they were] await[ing] a [c]ourt-trip." However, at his trial, Warren testified that he was housed in a court pen with Deas.  Even if Warren and Deas testified falsely about being housed in a court pen together, as Warren alleges, whether Warren and Deas were housed in a court pen is not a "material" matter, such that, without this testimony, "the defendant would most likely not have been convicted."  Id. Therefore, no basis exists for granting Warren habeas corpus relief on his claims of prosecutorial misconduct.

Evidence of Warren's Prior Bad Acts and Uncharged Crimes Was Admitted Improperly

Generally, evidentiary questions are matters of state law and raise no federal constitutional issue for habeas corpus review.  See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  "[T]o demonstrate that the admission of evidence by a state trial court constitutes a ground for federal habeas relief, a petitioner must demonstrate that

the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a

petitioner bears a heavy burden...."  Jones v. Conway, 442 F. Supp. 2d 113, 130 (S.D.N.Y. 2006).

"The introduction of improper evidence against a defendant does not amount to a violation of

due process unless the evidence 'is so extremely unfair that its admission violates fundamental

conceptions of justice.'"  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting

Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 674 [1990]).   The Supreme Court

has not ruled on whether the admission of an uncharged crime violates the Due Process Clause.

See Estelle, 502 U.S. at 75 n.5, 112 S.Ct. at 484 n.5 ("[W]e express no opinion on whether a

state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence

to show propensity to commit a charged crime.").

Even assuming, arguendo, the improper admission of "prior crimes" evidence violates an

"identifiable constitutional right," Altieri's and Price's testimony about a prior "relationship" that

existed between Altieri and Warren cannot be said to amount to evidence that "'is so extremely

unfair that its admission violates fundamental conceptions of justice.'"  Dunnigan v. Keane,

137 F.3d at 125 (quoting Dowling, 493 U.S. at 352, 110 S. Ct. at 674); see also Jones, 442 F.

Supp. 2d at 121, 131 (finding that – when a police officer was permitted to testify that the

defendant was "known [by a police officer] from previous incidents" – "nothing in the trial

record [] suggest[ed] that the evidence concerning the 'prior incidents' denied petitioner due

process of law").

As to Green's testimony, that the petitioner had offered a gun to him, evidence of

uncharged crimes or bad acts is admissible to prove a specific crime if it tends to establish,

inter alia, motive, intent, absence of mistake or accident, or the identity of the person charged

with the commission of the crime.  See Molineux, supra; see also Fed. R. Evid. 404(b).  Warren

was charged with second-degree murder; therefore, the prosecution was required to prove that

Phillips' death was caused by Warren's intentional act.  See New York Penal Law § 125.25(1)

(providing that a person is guilty of second-degree murder when, "[w]ith intent to cause the death

of another person, he causes the death of such person. . . .").  "Where the prejudicial evidence is

'probative of [an] essential element' in the case, its admission does not violate the defendant's

right to due process."  Dunnigan, 137 F.3d at 125 (quoting Estelle, 502 U.S. at 69, 112 S. Ct. at

481).   Green's testimony was probative of Warren's intent to have Phillips shot with a gun.

Therefore, no basis exists for granting Warren's request for habeas corpus relief, based on his

claim that evidence of uncharged crimes or prior bad acts was admitted, into the trial record, in

violation of his rights to due process and a fair trial.

Improper "Marshaling of the Evidence" by the Trial Court

"The purpose of marshaling the evidence by the trial judge is to provide a fair summary

of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict

impartiality."  United States v. Levy, 578 F.2d 896, 903 (2d Cir. 1978).  When faced with a claim

that the trial judge "marshal[ed] [] the evidence," so as to bias the jury, "a federal habeas court

'must find the trial court's conduct to be substantially significant and substantially adverse to the

defendant before it holds that the trial judge's conduct created an appearance of partiality which

exceeded constitutional limitations.'"  Copeland v. Walker, 258 F. Supp. 2d 105, 138 (E.D.N.Y.

2003) (quoting Jenkins v. Bara, 663 F. Supp. 891, 898-99 [E.D.N.Y. 1987]).

A review of the trial judge's instruction in this case, relating to credibility of police

officers, and, particularly, the statement Warren allegedly made to Altieri, reveals it was not

biased or prejudicial.  The trial judge did not "spend an inordinate amount of time marshaling the

evidence in support of the prosecution, nor did his recitation of the evidence insinuate any

antagonism towards the petitioner."  Copeland, 258 F. Supp. 2d at 138.

Warren's claim, that the trial judge marshaled evidence improperly, by commenting that

Juah's Staten Island criminal case "couldn't be too serious," after Juah indicated she had been

charged with a misdemeanor, has been considered by the Court in the context of the entire trial.

Having performed that exercise, the Court finds that the trial court's remark was not

"substantially significant and substantially adverse" to Warren so that it "created an appearance

of partiality which exceeded constitutional limitations."  Id. (internal quotations and citations

omitted).  Therefore, granting Warren's request for habeas corpus relief, respecting his

"marshaling" claim, is not warranted.

Right to be Present at all Stages of Trial

"The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as

applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . .

the 'right to be present at all stages of the trial where his absence might frustrate the fairness of

the proceedings.'"  Tennessee v. Lane, 541 U.S. 509, 523, 124 S. Ct. 1978, 1988 (2004) (quoting

Faretta v. California, 422 U.S. 806, 819 n.15, 95 S.Ct. 2525, 2533 n.15 [1975]).  The Supreme

Court has "assumed" that, even in a circumstance, where a criminal defendant "is not actually

confronting witnesses or evidence against him, he "has a due process right 'to be present in his

own person whenever his presence has a relation, reasonably substantial, to the fulness of his

opportunity to defend against the charge.'"  Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct.

2658, 2667 (1987) (quoting Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105-06,

54 S. Ct. 330, 332 [1934]).  "[T]he [Supreme] Court has emphasized that this privilege of

presence is not guaranteed when presence would be useless, or the benefit but a shadow."  Id.

(internal quotations and citations omitted).

Warren's and defense counsel's absence, when the trial court conveyed a message to the jurors, via a court officer, that the court could not "fill in" illegible material on a trial exhibit, and would attempt to secure the original of the exhibit for them, did not "frustrate the fairness of the proceedings." Tennessee, 541 U.S. at 523, 124 S. Ct. at 1988 (internal quotations and citations omitted). The record shows nothing was communicated by court officials to direct the jury's attention to one feature of the exhibit or another. The record also shows the trial judge's response, to the juror's inquiry, did not impact the status quo of the jury's deliberations: the jury continued deliberating without the original document and reached a verdict, without ever receiving the original document. Additionally, the jury confirmed it was able to continue its deliberations, without a more legible copy of the trial exhibit, and was polled to confirm that their verdict was unanimous. Warren "has given no indication that his presence [when the jury note was received and the trial court determined its response] would have been useful in ensuring a more reliable determination." Kentucky, 482 U.S. at 747, 107 S. Ct. at 2668. In essence, the court's message to the jury, gave it nothing more, with respect to the illegible exhibit, than what the jury had already been given. Accordingly, no due process violation occurred for which habeas corpus relief must be granted.

Ineffective Assistance of Trial Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1) "counsel's performance was deficient" i.e., falling below an objective standard of reasonableness; and (2) counsel's "deficient performance prejudiced the defense," that is, "counsel's errors were so serious [they deprived] the defendant of a fair trial, a trial whose result is reliable." See Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064 (1984). There is "a strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance."  Id. at 689, 104 S. Ct. at 2065.

    A.    Failure to Object to Flight Comments by Prosecutor and to
          Request a Flight Instruction

Warren maintains his trial counsel rendered ineffective assistance to him by failing to

object to the prosecution's comments, during opening and closing statements that, after Phillips'

death, Warren was "on the run" on Staten Island.  "It is well-settled that both the prosecution and

defense are entitled to broad latitude in the inferences they may suggest to the jury during closing

arguments, provided they do not misstate the evidence, refer to facts not in evidence, or express

counsel's personal belief as to guilt or innocence."  United States v. Smith, 778 F.2d 925, 929

(2d Cir. 1986) (internal quotations and citations omitted).  During his own testimony, Warren

was asked whether he was "on the run" from police and "on the run" on Staten Island, and he

answered both questions affirmatively, without contesting whether he was "on the run."  The

prosecutor's comments during opening and closing statements – that, Warren was "on the run in

Staten Island," and that Warren "ran as far as Staten Island" – summarized evidence provided

through Warren's testimony.  "Given the . . . broad latitude afforded parties in commenting on

evidence during summation," United States v. Bautista, 23 F.3d 726, 734 (2d Cir. 1994)

(internal quotations and citations omitted), it cannot be said that the prosecutor's summary of

the admitted evidence "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)

(internal quotations and citations omitted).

Similarly, Warren's contention that his trial attorney provided ineffective assistance to

him by failing to request a jury instruction from the court regarding flight as an indication of

guilt, based upon the prosecutor's comments, during opening and closing statements, is without merit. See Davis v. Strack, 270 F.3d 111, 123-24 (2d Cir. 2001) ("[C]ourts have granted habeas relief for a failure to [provide a jury instruction on a particular matter] where the evidence supported [such an instruction] under state law and where the erroneous failure to give such [an instruction] was sufficiently harmful to make the conviction unfair")(citing Cupp v. Naughten, 414 U.S. 141, 146, 94 S. Ct. 396, 400 [1973]); Robinson v. Ercole, No. 06-CV-1081, 2008 WL 2522506, at *5, 2008 U.S. Dist. LEXIS 48591, at *15 (E.D.N.Y. June 20, 2008) (quoting People v. Yazum, 13 N.Y.2d 302, 304, 246 N.Y.S.2d 626 [1963]) ("Under New York law, a trial court may give a jury instruction on a defendant's flight where there is evidence of flight . . . .")(internal quotations and citations omitted); see, e.g., United States v. Arboleda, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence.").

B.     Failure to Object to Admission of a Redacted Letter

In his third amended petition, Warren contends his trial counsel provided ineffective assistance to him, by failing to "subject[] the prosecution's case to the adversarial process," when he did not object to the admission into evidence of a prejudicial and redacted letter, written by Deas to McCloud.

There is a dearth of authority to support Warren's position that an attorney's failure to object to the admission of a document, into evidence at a trial, solely because information had been redacted from the document, renders ineffective assistance to his client.  In any event, Warren's claim is conclusory, since he neither explains how the redacted document was prejudicial to him, nor provides any indication of the breadth or subject matter of the redacted material.  See Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) ("Because this claim is merely a conclusory allegation, petitioner has failed to establish that his counsel's

performance was deficient," since a "bald assertion . . . fails to overcome the presumption that counsel acted reasonably.").  Furthermore, the jury submitted a note to the court, during deliberations, seeking a legible copy of this document, and reached a verdict without receiving a more legible copy; therefore, it appears that, whatever error may have resulted in counsel's failure to object to the admission of this document, the error was harmless.  See, e.g., Galvin v. Kelly, 79 F. Supp. 2d 265, 277 (W.D.N.Y. 2000) (finding that admission of a redacted statement did not violate the petitioner's Sixth Amendment right to confront witnesses, when proof of guilt was "overwhelming" and "the prejudicial effect of the [document] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the [document] was harmless error.").

With regard to Warren's claims that the content of the letter was prejudicial, and that allowing the document to be received in evidence, without objection, undermined the trial's "adversarial process," the trial transcript reveals that Warren's counsel used the letter written by Deas to impeach his testimony, that Warren had admitted to killing Phillips.  Defense counsel secured an admission from Deas that his testimony at trial regarding his conversation with Warren, while both men were incarcerated, differed from his account of that conversation in his letter to McCloud.  Therefore, Warren cannot show he was prejudiced by the admission of the letter into evidence or that the letter's admission into evidence reduced the efficacy of the "adversarial process."  See e.g., United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (noting that decisions relating to cross-examination and impeachment "fall squarely within the ambit of trial strategy, and, if reasonably made, cannot support an ineffective assistance claim") (internal quotations and citations omitted).

C.      Failure to Impeach Altieri

Warren asserts his trial counsel rendered ineffective assistance to him, when he failed to impeach Altieri, by demonstrating that Warren "requested a lawyer and Altieri was trying to hide that fact."  According to Warren, his trial counsel "had DD5's [showing] Detective Altieri took statements from Robert Porter," and "[h]ad counsel used this evidence, the trial court would not have been able to bolster Detective Altieri's credibility during the display of a video of petitioner requesting a lawyer."  Based on the text immediately above, the exact nature of the instant claim is unclear.  To the extent Warren may be suggesting Altieri attempted to "hide th[e] fact" that Warren requested an attorney, after Altieri advised him of his Miranda rights, Warren's testimony does not support such a claim.  Warren testified that he was "read [his] right[s], [and] signed V.W., [his] name," and was then questioned by Altieri.  Warren's testimony, that he signed his name after being given his rights, does not suggest that Warren requested an attorney when his rights were read to him.  With regard to Warren's claim that DD5s could have been used either to impeach, or prevent the bolstering of Altieri's credibility, Warren does not explain what information was contained within the DD5s or how the DD5s could have been used as he suggests.  See e.g., Matura, 875 F. Supp. at 237 (finding a conclusory allegation is insufficient to demonstrate that counsel's performance was deficient, since a "bald assertion . . . fails to overcome the presumption that counsel acted reasonably.").

D.      Failure to Locate a "Grandmother"

As discussed previously, in relation to Warren's claim that the prosecution engaged in misconduct, by failing to disclose two police memoranda, one of which included information on a "grandmother" who informed police officials that Green had fought with Phillips in the days before Phillips' murder, Green's testimony included descriptive information respecting his altercations

with Phillips.  Although Warren contends the "grandmother" also would have testified she saw

Green "dr[a]w a gun on Phillips," Green's testimony established he was offered a gun for use, after

he punched Phillips, during their second encounter.  Aside from Warren's conclusory allegation,

that his counsel was ineffective for not locating the "grandmother" so she could testify, there is no

indication that defense counsel's decision not to do so was other than a strategic one.  "[C]ounsel

presented far stronger evidence in support of" the issue of Green's previous fights with Phillips

during the days preceding Phillips' murder, and his access to a gun to use on Phillips, and,

therefore, "[c]ounsel could have reasonably determined that [the grandmother's] testimony would

have been cumulative or repetitive."  Ortiz v. Barkley, 558 F. Supp. 2d 444, 454 (S.D.N.Y. 2008).

E.       Failure to Object to Crime Scene Photographs

"The introduction of improper evidence against a defendant does not amount to a violation

of due process unless the admission is so extremely unfair that its admission violates fundamental

conceptions of justice."  Dunnigan, 137 F.3d at 125 (internal quotations and citations omitted).  In

New York, "[a]dmission of photographs of homicide victims is generally within the discretion of

the trial court," and "photographs of a corpse are admissible even though they portray a gruesome

spectacle and may tend to arouse passion and resentment against the defendant in the minds of the

jury."  People v. Pobliner, 32 N.Y.2d 356, 369-70, 345 N.Y.S.2d 482, 493 (1973) (internal

quotations and citations omitted).  Under New York law, "[p]hotographic evidence should be

excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the

defendant."  Id. at 370, 345 N.Y.S.2d at 493.

Warren asserts crime scene photographs should not have been admitted into evidence at his

trial, because "[t]here was no need to introduce all of these photo[graphs] into evidence"; however,

he does not suggest that the photographs were admitted for an improper purpose, such as to arouse

27

the emotions of the jury or to prejudice him.  Since Warren provides no basis for an objection to

crime scene photographs to have been lodged by his trial counsel, habeas corpus relief is not

warranted on this claim.  See Matura, 875 F. Supp. at 237.

F.      Failure to Object to Price's Testimony Relating to Anonymous Telephone Calls

Warren cannot establish that his counsel's performance was deficient, by reason of his

failure to object to Price's testimony regarding his receipt of anonymous telephone calls, since

Warren cannot show his counsel's failure to object was an error "so serious [it deprived Warren]

of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

Price testified that, as a result of speaking with witnesses, and hearing the content of anonymous

telephone calls he received, his investigation began to focus on Warren.  Even if defense counsel

had objected to Price's testimony, that he received anonymous telephone calls, Warren does not

challenge Price's testimony that he focused on Warren, as a suspect, as a result of his conversations

with witnesses.  Thus, Warren cannot show prejudice or that the result of his trial was not reliable

as a result of Price's testimony about anonymous telephone calls.  Id.

G.      Counsel's Failure to Interview Warren's Prior Defense Attorney

Warren contends he was denied due process and effective assistance of counsel, owing to

his trial counsel's "refus[al] to investigate and interview the petitioner's prior defense attorney."

Warren does not provide the name of his prior attorney, nor does he identify what information his

trial counsel could have obtained from his former counsel.  Since this claim is based upon a

conclusory allegation, Warren has not shown that he is entitled to habeas corpus relief based on

this claim.  See e.g., Matura, 875 F. Supp. at 237.

Ineffective Assistance of Appellate Counsel

The Strickland test applies to claims of ineffective assistance of appellate counsel.  See

Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000).

Warren's appellate counsel was not ineffective for failing to raise, on direct appeal, claims that: (1) the prosecution violated Brady; (2) the prosecution allowed Juah to perjure herself; and (3) the trial judge "interfered" improperly with Warren's trial, by "marshaling evidence," since, as discussed above, these claims lack merit.  See Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) ("[t]he failure to include a meritless argument [on appeal] does not fall outside the wide range of professionally competent assistance to which Petitioner was entitled") (internal quotations and citations omitted).  Additionally, appellate counsel was not ineffective for failing to raise a claim that Warren's trial counsel rendered ineffective assistance to him by failing to object to the trial court's communication with the jury outside of the presence of Warren and his counsel, since the trial transcript demonstrates that trial counsel did lodge an objection.  Id.  Appellate counsel also had no obligation to assert a claim that trial counsel was ineffective in failing to move to dismiss the indictment, since this claim was raised in Warren's fifth CPL § 440.10 motion, and was denied as procedurally barred, because the claim could have been raised earlier, on direct appeal or in one of Warren's four previous CPL § 440.10 motions.  Warren has not shown cause or prejudice for his default, or that a fundamental miscarriage of justice would result if he does not receive federal review of this claim; accordingly, this claim is procedurally barred from federal habeas corpus review.  See Harris, 489 U.S. at 262, 109 S. Ct. at 1043; see also Smith v. Artus, No. 03-CV-6636, 2009 WL 1726301, at *5, 2009 U.S. Dist. LEXIS 50264, at *14-17 (W.D.N.Y. June 16, 2009).

With regard to the remaining claims, Warren cannot establish he was prejudiced by his appellate counsel's performance, or that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Concerning his allegation that Altieri and Green had conflicting testimony between his first trial

29

and retrial, Warren notes Altieri's testimony differed, since, at the first trial, he testified he was

with Warren until 9:15 p.m., and, at Warren's retrial until 9:00 p.m.  This difference does not relate

to a material fact; therefore, it was well within appellate counsel's discretion to elect not to raise

this claim and to raise stronger claims.  See Jones v. Barnes, 463 U.S. 745, 751-53, 103 S.Ct. 3308,

3312-13 (1983) (providing that appellate counsel is not obligated to raise every "colorable issue,"

and may, as a matter of professional judgment, limit the appellate brief to only the strongest

arguments).

As to Green, Warren alleges that, at his first trial, Green testified about the position of

Phillips' body, to bolster the account given by the medical examiner, and also alleged

inconsistencies existed in Green's testimony during the retrial.  Green's testimony at the

petitioner's first trial was not presented at his retrial and, therefore, was not prejudicial to him.

Furthermore, Green's testimony during Warren's retrial, to a great extent, mirrors the petitioner's

testimony.  As previously discussed, Warren testified about his conversation with Green, and

Warren's testimony affirmed that Green and Warren discussed Phillips' death.  Therefore,

Warren's appellate counsel had no obligation to raise a claim relating to Green's testimony, since it

appears to lack merit.  Id.

Warren's hearsay claims relate to Price's testimony about anonymous telephone calls that,

inter alia, caused him to focus his investigation on Warren.  As discussed above, Warren's trial

counsel was not ineffective for failing to object to Price's trial testimony relaying the reason for

focusing his investigation on Warren.  Therefore, Warren's appellate counsel did not render

ineffective assistance to him by omitting a claim, in his brief on direct appeal, that Price's

testimony constituted hearsay and was admitted improperly into the trial record.

Warren's Huntley hearing claim fairs no better.  Warren maintains the trial court misstated

the facts in finding that, "after [Warren] was read his <u>Miranda</u> warnings he knowingly agreed to make a statement, after the oral statement was reduced to typing, defendant read it and found [it in] his best interest not to sign it."  Whether Warren agreed either to (a) answer questions, or (b) make a statement, is immaterial, for Warren does not contend he was not given <u>Miranda</u> rights before speaking with police personnel, and Warren's dissatisfaction with the writing prepared by Altieri was clear, since Warren refused to sign the written statement Altieri prepared.  Therefore, Warren's appellate counsel's decision to forgo a claim based upon the <u>Huntley</u> hearing does not constitute ineffective assistance to Warren.  Furthermore, the admission into evidence of the document prepared by Altieri was not improper, since the jury could observe that Warren did not sign the statement and could reasonably infer that Warren did not endorse its contents.

Warren's claim, that his appellate counsel was ineffective for failing to discuss counsel's appellate brief with Warren before filing it, does not warrant habeas corpus relief.  "[T]he Constitutional right to effective assistance of counsel does not encompass the requirement that an attorney consult with his client to discuss the alleged trial errors that his client wishes to pursue," and an "assertion that his appellate counsel failed to consult with petitioner prior to filing the appellate brief . . . does not, without more, establish that [the petitioner] received ineffective assistance."  <u>Campbell v. Greene</u>, 440 F. Supp. 2d 125, 152 (N.D.N.Y. 2006) (internal quotations and citations omitted).  Moreover, the Supreme Court has made clear that it is appellate counsel exercising discretion, after a professional evaluation of the trial record, who controls the preparation of the appellate brief.  <u>See Jones</u>, 463 U.S. at 751, 103 S. Ct. at 3313.

Warren's claim, that his appellate counsel failed to investigate Juah's criminal history – assuming, <u>arguendo</u>, this claim is true – provides no basis for habeas corpus relief.  Juah's trial testimony included an admission that she had a prior criminal record.  Since the jury was aware

Juah had a criminal record, evidence of additional crimes may not have had a significant effect on

the jury's assessment of Juah's credibility.  Therefore, appellate counsel's decision to pursue

stronger claims, in his appellate brief, does not establish that appellate counsel rendered ineffective

assistance to Warren.  See id., at 751-53, 103 S. Ct. at 3312-13.

Warren's appellate counsel did not render ineffective assistance to him for not raising a

claim, on direct appeal, that the trial court denied improperly trial counsel's request for recross-

examination of Juah, since Warren's trial counsel never requested recross-examination of Juah.

## IV.  RECOMMENDATION

For the reasons set forth above, I recommend that Warren's third amended petition for a

writ of habeas corpus, Docket Entry No. 49, be denied.

## V.  FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

the parties shall have ten (10) days from service of this Report to file written objections.  See

also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the

Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen

McMahon, 500 Pearl Street, Room 640, New York, New York, 10007, and to the chambers of

the undersigned, 40 Foley Square, Room 540, New York, New York, 10007.  Any requests for an

extension of time for filing objections must be directed to Judge McMahon.  FAILURE TO FILE

OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS

AND WILL PRECLUDE APPELLATE REVIEW.  See Thomas v. Arn, 474 U.S. 140, 106 S. Ct.

466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank

v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 58-59 (2d

Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237 (2d Cir. 1983).

\*   \*   \*

N.B. All unpublished opinions to which citation has been made are being provided to the

petitioner with a copy of this report.

Dated: New York, New York          Respectfully submitted,
      August 10, 2009

                                      KEVIN NATHANIEL FOX
                                      UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Vincent Warren
Nikki D. Woods, Esq.

33